## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| VIRGINIA DAVIDSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:04CV258SNL** |
| | ) | |
| TYCO/HEALTHCARE, | ) | |
| MALLINCKRODT, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

*Pro se* plaintiff has filed this employment discrimination action alleging race discrimination

and retaliation in connection with her employment termination in violation of Title VII and §1981;

interference and retaliation in connection with her rights under the Family and Medical Leave Act,

29 U.S.C. §2601; and violation of her rights under the Missouri Service Letter Act, §290.140

R.S.Mo. This matter is before the Court on the defendant's motion for summary judgment (#37),

filed October 20, 2004.[1] Responsive pleadings have been filed.[2] This matter is set for trial on the

Court's jury trial docket of June 13, 2005.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should

be granted only when the moving party has established his right to judgment with such clarity as

not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th

Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing

factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really

---

[1] As will be explained later in this opinion, the only party defendant in this case is
Mallinckrodt. Therefore, reference to "the defendant" is reference to defendant Mallinckrodt
only.

[2] On November 22, 2004 plaintiff filed a "voluminous" response to the instant summary
judgment motion in violation of Local Rule 4.01(D). *See*, Plaintiff' Response (#44). Plaintiff
was directed to refile her response in compliance with Local Rule 4.01(D) and the Court's order. *See*,
Court Order #49, filed December 17, 2004. Defendant was granted leave to file an amended
reply to any refiled response by the plaintiff. Thus, presently before the Court for its
consideration, is the defendant's summary judgment motion (#37); the plaintiff's amended
response (#50), filed December 27, 2004; and the defendant's amended reply (#51), filed January
10, 2005; as well as all exhibits filed with their respective pleading(s).

do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). Although summary judgment should seldom be granted in employment discrimination cases, it is proper in those cases wherein the plaintiff fails to establish a factual dispute on an essential element of the case. Snow v. Ridgeview Medical Center, 128 F.3d. 1201, 1205 (8th Cir. 1997), *citing* Bialas v. Greyhound Lines, Inc., 59 F.3d. 759, 762 (8th Cir. 1995). "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." Whitley v. Peer Review Sys., Inc., 221 F.3d. 1053, 1055 (8th Cir. 2000)(citations omitted). The Eighth Circuit has "repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based. Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable

inferences sustaining the position of the nonmoving party." <u>Hindman v. Transkrit Corp.</u>, 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); <i>see</i>, <u>Mayer v. Nextel West Corp.</u>, 318 F.3d. 803, 806 (8th Cir. 2003) <i>citing</i> <u>Keathley v. Ameritech Corp.</u>, 187 F.3d. 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. <u>Putnam v. Unity Health Systems, Inc.</u>, 348 F.3d. 732, 733-34 (8th Cir. 2003) <i>quoting</i> <u>Wilson v. Int'l Bus. Mach. Corp.</u>, 62 F.3d. 237, 241 (8th Cir. 1995); <u>Girten v. McRentals, Inc.</u>, 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment.").

After careful consideration, the Court finds the following facts germane to the issues raised by the plaintiff's complaint and the instant motion.[3] Plaintiff Davidson, an African-American woman, was employed by defendant Mallinckrodt from June 26, 1989 to January 28, 2003. Over the years she held various positions; however, at the time of her termination, she was employed as an Accounting Clerk III in the Distributor Reporting Department. The Distributor Reporting Department handled a variety of accounting and processing functions related to indirect sales made for Mallinckrodt through authorized distributors.

Although plaintiff names "Tyco/Healthcare Mallinckrodt" as the sole party defendant, such an entity does not exist. Mallinckrodt is a limited partner of Tyco Healthcare Group LP; however, it is a separate legal entity. Defendant's Exhibit 1-Declaration of Linda K. Graham (attached to defendant's memorandum in support of summary judgment motion). Whether or not

---

[3]The facts, as determined by the Court, are largely extracted from the pleadings and exhibits filed by the parties. However, the Court recognizes that the plaintiff's exhibits, including her affidavit, contains numerous instances of hearsay, legal conclusions, speculations, and unsupported allegations of wrongdoing outside the parameters of the issues present in this case. Such "evidence" has not been considered by the Court in reaching its determinations. A prime example of "evidence" excluded from consideration by the Court are plaintiff's Exhibits 16 and 29 which are purported to be plaintiff's "transcription" of allegedly tape-recorded conversations with defendant's employees. These "transcriptions" are self-serving and are not properly authenticated; consequently, they are not proper evidence for the Court to consider on summary judgment. Finally, the Court will cite to a specific exhibit when necessary for purposes of clarity; and in instances of duplicative exhibits filed by the parties, the Court's citation to one party's exhibit is not indicative of any bias on the part of the Court.

both entities share "signage" space is irrelevant to the issue of plaintiff's employer. Being listed on a sign does not create a legally binding employer-employee relationship. Plaintiff has offered no evidence to dispute Ms. Graham's declaration. Thus, the Court finds that Mallinckrodt alone is the sole employer of the plaintiff and is the party defendant in this case.

During the relevant time-period, plaintiff's immediate supervisor was Tom Hill (white male). Sandy Schott (white female) supervised Hill as the Director of Distributor Reporting and Deductions. During the relevant time-period, two other women, among others, were plaintiff's co-workers in the Distributor Reporting Department: Barbara Bull (white woman) and Alicia Buchanan (black woman).

Sometime in 2000-2001 plaintiff avers that she began complaining about "disparity" in her workload, especially in comparison with her co-worker Ms. Bull. Plaintiff's Deposition, pgs. 50-52; 61-63. She made her workload complaints to Susan Campbell, Bob Moore, Gabby Bush, Bob Martsching and Gloria Schmidt. Although she complained about "unfair" workloads, she never complained about racial discrimination in connection with the workloads.

In a performance appraisal for the period July 1, 2000 to September 30, 2001, Hill noted:

> "Given her number of years in chargeback processing, Virginia should be more knowledgeable and productive than she is today. She needs to be more proactive in obtaining the information needed to clear submissions on a timely basis . . . Virginia took on some Lafayette distributors, but her workload would not be considered more than her peers given the size of the distributors . . . The Distributor Administration Analysts have had significant change over the past year from new systems, additional responsibilities, and different managers."

Defendant's Exhibit 2-Declaration of Sandy Schott and Exhibit A thereto. On October 12, 2001, plaintiff responded in writing to this performance appraisal stating "during processing I tend to focus more on gathering pertinent information prior to pushing a submission to ensure quality, which encumbers quantity." Schott Declaration and Exhibit B thereto.

Meanwhile, plaintiff continued to complain about her workload. She believed that Ms. Bull had a lesser workload than her but never attributed it to race. Plaintiff's Deposition, pgs. 61-64. Bull had transferred into the department without experience in accounting or in processing rebates. Management decided to give Bull other responsibilities in the contracts department and

-4-

redistributed a part of her workload among plaintiff and other employees within the department. Schott Declaration; Plaintiff's Deposition, pgs. 63-64, 69-70.

In June 2002, an account called Allegiance, which plaintiff had been handling, was reassigned to one of plaintiff's co-workers. On June 12, 2002 plaintiff sent an e-mail to both Hill and Schott in which she attempts to explain the problems with the account and why she should not be considered responsible for them. She emphasizes that she is a "team player" and a hard worker; but that her perspective is different from management's perspective. She states "[A]lhough I feel that in our ever-changing department with great deadline restraints, it seems that very little thought is considered for in-depth detailed discrepancy research which is highly important for accurate chargebacks. It seems that more focus is on the end result rather than what it takes, or how much it takes to get there." Schott Declaration and Exhibit C thereto. Plaintiff ends her e-mail by stating "[A]s we discussed yesterday, I do hope that realigning Allegiance will not be a reflection or have any negative bearings on my performance." Again, nowhere in the e-mail does plaintiff make any reference whatsoever to race discrimination or any action being taken by defendant on account of race.

On August 8, 2002 plaintiff was placed on a performance improvement plan (PIP) by Hill and Schott. Schott Declaration and Exhibit D thereto. The PIP references a January 16, 2002 meeting in which performance issues were discussed with the plaintiff, and subsequent department meeting to review plaintiff's responsibilities (as well as her co-workers). The PIP further references that over the past year the department had changed computer systems (from the CARS system to PARTNER).[4] According to the PIP, plaintiff's work performance problems were not attributable to the transition, stating "[H]owever, the nucleus of your responsibilities were not changed and the ability to provide complete and accurate information as well as timely and accurate chargeback/sales tracing processing is still a requirement." The PIP goes on to note that

---

[4]The change in computer systems enabled the department's functions to become more automated. As a result of the increased automation, and less need to process paperwork, the department went from having 65 customers who used paper submissions to only 9 customers who continued to do so, the rest having converted to electronic submissions. The change eliminated the need to have employees manually key the information into the computer(s). Schott Declaration; Plaintiff's Deposition, pgs. 169, 171.

"[O]ver the past several months you have had problems in maintaining the distributor log . . . you have misplaced critical information . . . [Y]ou incorrectly pulled the Allegiance EDI April information and marked as March as well as the May information and marked as April . . . [Y]ou calculated a large overpayment of $170,724.43 for the March 2002 Allegiance batch . . . [F]or Allegiance April 2002 batch 9 lines were deleted from the batch that should have been paid . . . [W]ithout the backup information we cannot determine why this was done." The PIP further notes that plaintiff's current distributor assignment had the fewest lines to process of all her peers, but that she still required overtime to complete her tasks. Schott Declaration and Exhibit D; Plaintiff's Deposition, pgs. 176-77, 180.

The PIP provides six (6) areas of improvement for plaintiff to focus upon over the next ninety (90) days. It further provides that Hill would meet with plaintiff every two (2) weeks to discuss her progress and that a thirty (30) day progress report would be provided to plaintiff on September 9, 2002. Schott Declaration and Exhibit D thereto.

At the bottom of the PIP, plaintiff wrote "[I] do not agree with this 90 day . . . My signature is to validate that we discussed this." She signed and dated it "8/8/02". Plaintiff admits that she has no basis to dispute the accuracy of the deficiencies cited in the PIP but that she believes it to be "unfair" because despite the PIP noting past discussions with her, she does not think these deficiencies had ever been discussed with her. Plaintiff's Deposition, pgs. 173-80.

On the same day (August 8, 2002) that plaintiff was placed on a PIP, another employee in same department, Linda Walsh (white woman) was placed on a PIP by Hill and Schott. Being placed on a PIP did not affect plaintiff's pay, nor was she disciplined. The purpose of the PIP was to assist plaintiff in improving her job performance. Schott Declaration.

Although plaintiff requested that Hill provide her with documentation to support the deficiencies noted, she did not wait for him to provide same. Plaintiff's Deposition, pg. 178. Plaintiff left that day and began a lengthy "medical leave" of over five (5) months allegedly due to "work-related stress".

On August 16, 2002 Heather Steele, defendant's Human Resources Manager, sent

plaintiff a letter notifying plaintiff that since she had been absent from work for three (3) consecutive days, defendant considered her absence to be due to a "serious medical condition" and thus, plaintiff was put on notice of her rights and entitlements under the Family and Medical Leave Act (FMLA) and invited to formally apply for leave under the FMLA. Graham Declaration and Exhibit B attached thereto. Ms. Steele also included (with the letter) a pamphlet entitled "Request for Leave under the Family and Medical Leave Act form"; a copy of the "U.S. Department of Labor Notice"; and the "Department of Labor Form for Certification by your Health Care Provider". Plaintiff acknowledges receipt of the August 16, 2002 letter and the FMLA-related information. Plaintiff's Deposition, pgs. 182-83.

Ms. Steele not only sent plaintiff information and forms regarding FMLA, but also assisted plaintiff in applying for FMLA leave and applying for short-term disability benefits through defendant's employee welfare program. Plaintiff's Deposition, pgs. 183-84. With Ms. Steele's assistance, plaintiff completed the necessary forms and her leave was designated as a FMLA leave, beginning in mid-August 2002. Plaintiff also was found eligible for short-term disability benefits and began receiving same. Graham Declaration; Plaintiff's Deposition, pgs. 184.

Defendant's corporate policy for family and medical leaves of absence, in accordance with FMLA, provides in pertinent part: "[a]t the conclusion of the leave, the employee will generally be entitled to his/her last position or to an equivalent position, including equivalent benefits, pay and terms and conditions of employment. If the employee is unable to perform his/her own job duties at the end of the leave, the employee need not be reinstated." Graham Declaration and Exhibit C thereto.

Defendant's short-term disability plan is managed by Aetna. Aetna is responsible for reviewing all employee claims for short-term disability benefits. Defendant's Exhibit B - Declaration of Linda K. Graham (attached to defendant's amended reply). Upon Aetna's certification and approval of a disability claim, defendant pays the employee short-term disability benefits according to a preordained benefit schedule. Under defendant's short-term disability leave policy, an employee may continue to receive benefits for a total of 26 weeks provided that the employee continues to be medically disabled and Aetna continues to approve (or re-certify)

disability benefits. Graham Declaration. If an employee's healthcare provider fails to provide proper medical documentation of a continuing disability on a timely basis, approval or recertification and the resulting benefit payments could be delayed. Graham Declaration.

On August 31, 2002 plaintiff wrote a letter to Bob Martsching, defendant's Vice-President of Contract Operations, expressing her disagreement with being placed on a PIP. Graham Declaration and Exhibit A attached thereto. She repeats her allegations of "episodes of unprofessional, unfair and retaliatory conduct". She provides two (2) examples of such episodes" the PIP which she characterizes as "unwarranted, fallacious, malicious and contradictory to facts known by and personally brought to the attention of management" and believes to be "retaliatory"; and a meeting on October 10, 2001 at which a co-worker (Renee Reid) announced that plaintiff was absent when (plaintiff asserts) in fact plaintiff was present. Plaintiff characterizes this incident as not being minor because "[R]enee has made it an obvious mission to intimidate, humiliate, speak to me in a demeaning manner and falsely characterize me as a deficient employee on many occasions gives rise to a behavior I am sure is prohibited." Graham Declaration and Exhibit A attached thereto. Nowhere in the letter does plaintiff state that any action directed towards her was racial in nature; or that anyone, including Ms. Reid, had ever made derogatory racial remarks to her.

On October 24, 2002 Russ Piraino, a member of defendant's legal department, sent plaintiff a letter informing her that her FMLA leave would be ending on November 6, 2002. It further stated "[I]f we have not received notification from Aetna of their continued certification of your need to be away from work by the last day of your FMLA period, we will have to consider this as job abandonment and will be forced to move to terminate your employment with the company. It is your responsibility to ensure that your doctor(s) has provided the pertinent information to Aetna needed to certify your continuance on STD." The letter finally informs plaintiff that Aetna had only certified plaintiff's continuance on STD through September 24, 2002. Graham Declaration and Exhibit D attached thereto. Plaintiff admits to receiving this letter. Plaintiff's Deposition, pgs. 187-88.

Plaintiff did not return to work as of November 6, 2002, the end of her FMLA leave nor

provide the defendant with any release to work by her treating doctor as of that date. Graham Declaration; Plaintiff's Deposition, pg. 190.

Following Piraino's letter of October 24, 2002, Aetna, by correspondence dated October 24, 2002, recertified plaintiff's STD for a period from September 25, 2002 through November 24, 2002. Plaintiff's Exhibit 15. In correspondence dated December 2, 2002 Aetna again recertified plaintiff's STD for a period from November 25, 2002 through December 5, 2002. Plaintiff's Exhibit 15.

By letter dated December 19, 2002, Ms. Steele informed plaintiff that her STD was scheduled to end on February 10, 2003. It further noted that as of February 10, 2003 plaintiff's employment was scheduled to end, the same date her STD period ends. Finally, the letter notes that plaintiff had requested long-term disability coverage and Ms. Steele was enclosing an application for same. Plaintiff's Exhibit 17.

During plaintiff's absence, her work duties were absorbed by other employees in the department. No one was hired by defendant to fill plaintiff's position. Schott Declaration; Plaintiff's Deposition, pg. 180.

While plaintiff was out on FMLA leave and STD, management had been undertaking an effort to make the Distributor Reporting Department more efficient and streamlined. One method to accomplish this goal was the transition from the CARS computer system to the PARTNER system. As stated before, the switch in computer systems enabled more of defendant's customers to electronically file their submissions, instead of paper submissions requiring defendant's employees to key in the information into the computer. Thus, the transition enabled the department to effectively operate with less employees. Schott Declaration.

In January 2003, Hill and Schott decided to eliminate one (1) position in the department, while planning on other positions being eliminated through attrition. Schott Declaration. In order to assess which position to eliminate, they created an objective "Position Criteria and Candidate Assessment (PCCA)" test of the department's employees, including plaintiff.

In the PCCA, employees were ranked according to analytical skills, accounts receivable

knowledge, communication skills, teamwork, organizational skills-multitask, self-directed, and quality of work. Schott Declaration and Exhibit E attached thereto. Although plaintiff disputes any knowledge of a "reduction-in-force" being conducted in her department during her FMLA leave, she admits that the criteria listed in the PCCA are all factors important and relevant to consider regarding an employee's position in her department. Plaintiff's Deposition, pgs. 196-97.

Plaintiff received the lowest weighted PCCA score of all the department's employees. Linda Walsh, the other employee placed on a PIP had the second lowest weighted PCCA score. Alicia Buchanan, the other African-American employee and one of the newest members of the department, had the third lowest weighted PCCA score. Schott Declaration and Exhibit E attached thereto. Plaintiff's position was selected for elimination.

Following elimination of her position, plaintiff's position was never refilled. Consistent with Hill and Schott's reduction-in-force plans, other positions were eliminated through attrition and not refilled. In 2003-04, employees Koerber, Fields, and Wheeler (white) left the department and their duties were absorbed by the remaining employees and their positions were not refilled. Schott Declaration.

Plaintiff returned to work on or about January 21, 2003. At that time she was informed by Rhonda Gibby, defendant's Human Resources Director, that plaintiff's position had been eliminated. Defendant's Exhibit A-Declaration of Rhonda Gibby (attached to defendant's amended reply); Graham Declaration; Plaintiff's Deposition, pg. 139. On this same date, Ms. Gibby arranged for plaintiff to review other job postings and to interview for one of four openings in the customer service department. Graham Declaration; Defendant's Exhibit C-Declaration of George Saffold (attached to defendant's amended reply); Plaintiff's Deposition, pgs. 128, 139-40. Four other applicants were hired for the customer service department openings: Sharon Little (African-American female); Debra Thomas (African-American female); Nicole Simpson (white female); and Angela Burkett (white female). Saffold Declaration. Plaintiff did not interview for any other open positions with the defendant.

On January 28, 2003 Carter Bright of defendant's Human Resources department informed

plaintiff that because her position had been eliminated, her employment with the defendant had been terminated.  Plaintiff's Exhibit - Deposition of Carter Bright, pg. 19.  Plaintiff was offered a severance package which included 26.5 weeks of pay and the use of defendant's outplacement services, at defendant's expense, to assist her in locating another job.  Graham Declaration and Exhibit E attached thereto; Plaintiff's Deposition, pg. 225.  Plaintiff rejected the severance package.  Plaintiff's Deposition, pg. 225.

On January 28, 2003 plaintiff wrote Mr. Bright expressing her outrage at having her employment terminated.  She expressed her opinion that she had been promised a position with defendant upon her return from "medical leave".  She further states "[F]or this reason, along with others, I find your employment decision outrageous, unlawful, and without merit.  Unfortunately, it appears that I am being further victimized inasmuch as you terminated me without explanation or justification."  Plaintiff's Exhibit 22.  She demands that her employment be reinstated.  Nowhere in this letter does she aver that her termination was improperly made on racial grounds or that any employment action has been taken against her based on racial grounds or in retaliation for complaining about racial discrimination.

On or about May 12, 2003 plaintiff filed a petition in the Circuit Court for St. Louis County against defendant alleging that defendant had failed to issue her a service letter in violation of the Missouri Service Letter Statute, §290.140 R.S.Mo.  Defendant's Exhibit 5.  On May 4, 2004 the state court entered summary judgment in favor of the defendant on plaintiff's service letter violation claim.  Defendant's Exhibit 6.

Meanwhile, on April 11, 2003 plaintiff filed a charge of discrimination against defendant with the EEOC.  On December 4, 2003 the EEOC dismissed the charge and issued plaintiff a Right-to-Sue letter.  Plaintiff's Complaint.  Plaintiff filed her judicial complaint, which is presently before this Court, on March 2, 2004.

### Title VII and §1981 Discriminatory Treatment and Retaliation

Although plaintiff's pleadings tend to be weighted down with extraneous discussion of issues not properly before this Court, it appears that plaintiff's racial discrimination claims are

1) that a white employee was given more favorable treatment regarding complaints of work overload; 2) that plaintiff was singled out as the only black employee to receive a Performance Improvement Plan (PIP); 3) plaintiff, as the only black employee, was terminated as a result of the alleged RIF; and 4) said termination was done in retaliation for past complaints of race discrimination. Defendant contends that plaintiff is unable to establish a *prima facie* case of race discrimination as to both her discriminatory treatment and retaliation claims. It contends that plaintiff cannot demonstrate that any similarly-situated employees (outside plaintiff's protected class) were treated more favorably; and that plaintiff never engaged in any protected activity for which defendant retaliated discriminatorily.

Since plaintiff's claims of race discrimination and retaliation are based on the same alleged conduct, the two claims will be addressed simultaneously. Also, because the elements of Title VII and §1981 discrimination claims are the same, the Court's analysis will be applicable to both. Putnam, at 735, n.2; Saulsberry v. St. Mary's University of Minnesota, 318 F.3d. 862, 866 (8th Cir. 2003).

A plaintiff may prove intentional race discrimination using either direct or indirect (circumstantial) evidence. Since plaintiff's claims are based on inferences to be drawn from circumstantial evidence, her claims will be analyzed under the burden-shifting framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this analysis, the plaintiff has the initial burden of establishing a *prima facie* case of intentional discrimination by a preponderance of the evidence. If the plaintiff successfully establishes a *prima facie* case of intentional discrimination, the burden shifts to the defendant employer to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant employer meets this burden of production, the plaintiff employee must show by a preponderance of the evidence that the articulated reason(s) for the challenged employment action was in fact not the true reason but a pretext for discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Tolen v. Ashcroft, 377 F.3d. 879, 882 (8th Cir. 2004); Putnam, at 735.

The threshold of proof required in establishing a *prima face* case of intentional

discrimination is "minimal". <u>Johnson v. Arkansas State Police</u>, 10 F.3d. 547, 551 (8th Cir. 1993).

"The elements necessary to establish a prima facie case vary according to the circumstances of the alleged discrimination. <u>Favors v. Fisher</u>, 13 F.3d. 1235, 1237 (8th Cir. 1994) *quoting* <u>Jones v. Frank</u>, 973 F.2d. 673, 676 (8th Cir. 1992). To establish a *prima facie* case of race discrimination, a plaintiff must show: 1) that s/he is a member of a protected class; 2) that s/he was meeting the defendant employer's legitimate job expectations; 3) that s/he suffered an adverse employment action; and 4) that circumstances exist which give rise to an inference of discrimination. <u>Wheeler v. Aventis Pharmaceuticals</u>, 360 F.3d. 853, 857 (8th Cir. 2004). In discharge cases, the fourth element may be met by showing that the plaintiff was replaced by a person with similar qualifications (and generally outside the protected class). Absent a showing that the plaintiff was replaced, s/he may still meet the *prima facie* burden by showing that similarly-situated employees (outside the protected class) were more favorably treated. <u>Tolen</u>, at 882; <u>Putnam</u>, at 736. In reduction-in-force cases involving a claim of race discrimination, a plaintiff must make an additional showing that race was a factor in the adverse employment action. <u>Putnam</u>, at 736; <u>Ahmed v. American Red Cross</u>, 218 F.3d. 932 (8th Cir. 2000); <u>Hughes v. Ortho Pharmaceutical Corp.</u>, at 705; <u>Herrero v. St. Louis Univ.</u>, 109 F.3d. 481, 483-84 (8th Cir. 1997).[5]

The first matter to be resolved is plaintiff's assertion that this is not a RIF case because she was not notified in advance, and she was the only one terminated. Both arguments are meritless. The RIF instituted by defendant was not part of a plant closing or a mass layoff (50 or more employees), therefore, formal advance notice was not required under the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. §2101 *et. seq.* Furthermore, a bonafide RIF is not dependent on a certain number of employees having their positions eliminated. *See*, <u>Groves</u>,

_____

[5]In <u>Groves v. Cost Planning and Management International</u>, 372 F.3d. 1008, 1010 (8th Cir. 2004) the Eighth Circuit appears to place the "additional showing" requirement at the pretext stage as opposed to the *prima facie* stage in stating "that in addition to showing pretext, plaintiffs in reduction of force cases must also show their protected status was a factor in the adverse employment decision." <u>Id.</u>, at 1010. However, in support of this statement, the Court cites to <u>Chambers v. Metropolitan Prop. & Cas. Ins.</u>, 351 F.3d. 848, 855-56 (8th Cir. 2003), an ADEA case. Since the majority of race discrimination reduction-in-force cases place this "additional showing" requirement at the *prima facie* stage, this Court will follow suit. However, regardless at which stage of the <u>McDonnell-Douglas</u> burden-shift the "additional showing" is required, plaintiff Davidson has failed to present sufficient evidence to meet this requirement.

*supra.* (affirming summary judgment for employer who implemented a RIF resulting in the discharge of two employees); <u>Hughes</u>, *supra.* (affirming summary judgment for employer who implemented a RIF resulting in the discharge of four employees; two of whom were African-American); <u>Herrero</u>, *supra.* (affirming summary judgment for employer who implemented a RIF resulting in the termination of four employees and transfer of one employee).

Thus, the Court finds that defendant did implement a RIF which resulted in the elimination of plaintiff's position within the Distributor Reporting Department.

As regards plaintiff's workload claim, she contends that a white employee, Barbara Bull, was treated more favorably than plaintiff was when both complained about their workloads. Defendant contends that Ms. Bull was not similarly-situated to plaintiff, and that although her workload within the Distributor Reporting Department was reduced, Ms. Bull was given other responsibilities in another department. Furthermore, when Ms. Bull was transferred to a new group, her remaining work in plaintiff's department was distributed to all of the remaining employees (not just plaintiff).

To be similarly situated for Title VII (and §1981) purposes, the comparable employee(s) must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. <u>Tolen</u>, at 882-83; <u>Cherry v. Ritenour School District</u>, 361 F.3d. 474, 479 (8th Cir. 2004); <u>Marquez v. Bridgestone/Firestone, Inc.</u>, 353 F.3d. 1037, 1038 (8th Cir. 2004); <u>Gilmore v. A.T.&T.</u>, 319 F.3d. 1042, 1046 (8th Cir. 2003). Although the test for "similarly-situated" is "not onerous" at the *prima facie* stage, plaintiff must still show that she and Ms. Bull were similarly situated in all relevant respects. <u>Wheeler</u>, at 857-58.

Plaintiff has offered no affirmative evidence disputing the fact that Ms. Bull had less experience than plaintiff in the workings of the Distributor Reporting Department. She has no affirmative evidence disputing the fact that although Ms. Bull had less of a workload in the Distributor Reporting Department, she did not have a lighter workload in total because she had other additional responsibilities in another department. Finally, plaintiff offers no affirmative evidence disputing the fact that due to a restructuring in the department, when Ms. Bull was

transferred, her duties were distributed among all remaining employees (including the white employees) in the Distributor Reporting Department. Plaintiff has failed to make a *prima facie* case of race discrimination as to her workload claim.

Assuming that plaintiff had established her *prima facie* case in connection with her workload claim, defendant has articulated a legitimate, non-discriminatory reason for the different treatment; i.e. Ms. Bull had less experience in the workings of the Distributor Reporting Department; she had additional duties in another department; and when she was transferred, her duties in the Distributor Reporting Department were allocated among all employees, including the white employees. Plaintiff asserts that such reasons are a pretext because the only difference between her and Ms. Bull was race, and that an investigation had revealed that plaintiff did have a heavier workload.

The burden for establishing "similarly-situated" at the pretext stage is rigorous. Wheeler, at 857-58. As stated before, plaintiff has not provided any affirmative evidence to dispute the fact that Ms. Bull lacked the experience that plaintiff possessed or that Ms. Bull had additional work responsibilities outside plaintiff's department, or that upon transfer Ms. Bull's work was distributed among all employees in plaintiff's department. Plaintiff's additional evidence that race was a motivating factor regarding the different treatment of her and Ms. Bull is the affidavit of Gloria J. Schmidt. Plaintiff's Exhibit 8.

In her affidavit, Ms. Schmidt attests that based on Ms. Bull's and plaintiff's complaints about their respective workloads, in July-August 2000, she initiated an investigation into workload distributions within the department. Based on a computer-generated report, she concluded that plaintiff's workload exceeded Ms. Bull's workload. She further attests that she shortly thereafter left defendant's employ. She further attests that the report was in an Excel workbook which remained on her personal computer when she left defendant's employ.

This "evidence" fails to meet the rigorous burden required to establish pretext. Even assuming that plaintiff's workload exceeded Ms. Bull's, Ms. Schmidt's affidavit does not refute the fact that Ms. Bull had additional work responsibilities outside plaintiff's department. Furthermore, there is no evidence presented that the "favorable report" was ever taken off of Ms. Schmidt's

personal computer and distributed to either Hill or Schott, plaintiff's supervisors during the applicable time-period. Finally, employers have wide latitude to make business decisions and it is not within the Court's "province to decide whether that reason [for the employer's employment action] was wise, fair, or even correct, ultimately, so long as it truly was the reason." Rollins v. Missouri Dept. of Conservation, 315 F.Supp.2d. 1011, 1025 (W.D.Mo. 2004) *quoting* Wilking v. County of Ramsey, 153 F.3d. 869, 873 (8th Cir. 1998). Plaintiff has offered no evidence that the defendant's reasons for the different treatment were not the real reasons but instead a pretext for race discrimination. Plaintiff's claim of race discrimination as to her workload complaint fails.

As to her PIP claim, plaintiff also has failed to make a *prima facie* case of race discrimination. It is unclear as to whether plaintiff is asserting that being placed on a PIP in and of itself was discriminatory or that she was placed on a PIP in retaliation for past complaints. In either case, plaintiff has failed to establish a *prima facie* case.

In terms of discriminatory treatment, plaintiff has adduced no evidence that being placed on a PIP was done on the basis of race. In none of her correspondence to her supervisors does she complain of race discrimination; she only complains that placing her on a PIP was "unfair" or "malicious". In her deposition, she only can speculate that being placed on the PIP was racially motivated because she contends that she was the only black employee in the department and the only employee placed on a PIP. Both contentions are incorrect. Plaintiff was not the only African-American employee in the Distributor Reporting Department; Alicia Buchanan was the other African-American employee in the department during the relevant time-period. Furthermore, the same date plaintiff was placed on the PIP, another white employee in plaintiff's department, Linda Walsh, was placed on a PIP. Plaintiff's questioning of the deficiencies noted on her PIP is insufficient to create a genuine issue of material fact raising an inference of race discrimination where her assertions are totally unsupported by the record before the Court. *See*, Shanklin v. Fitzgerald, 397 F.3d. 596, 603 (8th Cir. 2005).

Furthermore, plaintiff has failed to make a *prima facie* case of race discrimination concerning the PIP because she has failed to show that she suffered an adverse employment action as a result of it. An adverse employment action must have a "materially adverse impact" on the

terms or conditions of the plaintiff's employment. Tademe v. Saint Cloud State University, 328 F.3d. 982, 992 (8th Cir. 2003); Sowell v. Alumina Ceramics, Inc., 251 F.3d. 678, 684 (8th Cir. 2001); Bradley v. Widnall, 232 F.3d. 626, 632 (8th Cir. 2000); Kerns v. Capital Graphics, 178 F.3d. 1011, 1016 (8th Cir. 1998). "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Cooney v. Union Pacific Railroad Co., 258 F.3d. 731, 734 (8th Cir. 2001) *quoting* Spears v. Missouri Dept. of Corrections and Human Resources, 210 F.3d. 850, 853 (8th Cir. 2000). Termination, reduction in pay or benefits, and changes in employment that significantly alters an employee's future employment prospects such as demotion generally meet this standard; however, minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not rise to the level of an actionable employment decision. Spears, at 853 *citing* Kerns, at 1016 and Ledergerber v. Stangler, 122 F.3d. 1142, 1144 (8th Cir. 1997). "Although `actions short of termination may constitute an adverse employment action within the meaning of the statute, `not everything that makes an employee unhappy is an actionable adverse action.'" Tademe, at 992 *quoting* Manning v. Metropolitan Life Ins. Co., 127 F.3d. 686, 692 (8th Cir. 1992)(*quoting* Montandon v. Farmland Inds., Inc., 116 F.3d.355, 359 (8th Cir. 1997).

Being placed on a PIP does not constitute an actionable "adverse employment action". Firstly, plaintiff left immediately upon being placed on the PIP and was out on FMLA leave and STD (short term disability) leave for over five (5) months, so the PIP had no effect whatsoever on her. Secondly, the PIP did not affect her pay, her position within the department, or any other material condition of her employment. It only highlighted certain areas of performance that plaintiff was to focus upon improving and subjected her to a schedule of performance reviews. Thus, the PIP does not constitute an "adverse employment action" and plaintiff has failed to make a *prima facie* case of race discrimination.

In order to make a *prima facie* case of retaliation in connection with the PIP, plaintiff must show 1) that she engaged in a statutorily protected activity; 2) that defendant took an adverse employment action against her; and 3) that the adverse employment action was causally related to the plaintiff's protected activity. Tolen, at 883; Saulsberry, at 868; Sowell, at 684.

Statutorily protected activity includes opposing an act of discrimination made unlawful by Title VII (and/or §1981). *See*, Hunt v. Nebraska Public Power Dist., 282 F.3d. 1021, 1028 (8th Cir. 2002).

Plaintiff has failed to provide sufficient evidence that she engaged in a statutorily protected activity. In her letter to Hill, dated August 31, 2002 she complains vehemently about being placed on the PIP. She complains about the PIP and other alleged conduct as being "unfair", "unprofessional", "unwarranted", "fallacious", "malicious", and "contradictory to facts". However, nowhere does she communicate her belief that being placed on the PIP was racially motivated. In her affidavit, she makes vague, unsubstantiated assertions that she has complained about "many incidents" over her term of employment with defendant. However, she fails to provide any details regarding these "many incidents" nor any details regarding her complaints; i.e. when these incidents occurred, whom she reported these incidents to, and more importantly, whether she specifically complained of race discrimination or racial motives in connection with these "many incidents". As defendant notes, there is no evidence that plaintiff ever made these alleged complaints, racial or otherwise, to either Hill or Schott, the supervisors instrumental in the decision to place her on a PIP.

Furthermore, as discussed before, the PIP itself nor being placed on a PIP constitute an adverse employment action. Thus, plaintiff has failed to establish a *prima facie* case of retaliation in connection with her PIP claim.

Finally, plaintiff claims that the elimination of her position as a result of the RIF was racially motivated and/or was in retaliation for past complaints. After reviewing the record before the Court, the Court finds that the plaintiff has failed to produce sufficient evidence that her position was eliminated for racial reasons, that the RIF was a pretext for race discrimination, and/or that her position was selected for elimination in retaliation for past complaints.

The PCCA that Hill and Schott performed on each employee in plaintiff's department employed seven (7) different criteria: analytical skills, accounts receivable knowledge, communication skills, teamwork, organizational skills, self-directedness, and quality of work. Such criteria for determining the least valuable employee in a department has been found to be a legitimate, nondiscriminatory basis for eliminating the position of the lowest-rated employee. *See*,

<u>Groves</u>, at 1009-10.  Plaintiff's "evidence" of pretext is only her subjective opinion that she should not have been rated as the lowest and that the PCCA was an "informal, secretive and subjective employment decision."  Plaintiff's Response, pg. 9.  Such evidence "amounts to nothing more than a critique of the defendant's business judgment in accomplishing its reduction in force."  <u>Ahmed</u>, at 933.  She offers no evidence that race placed any role in creating the criteria for the PCCA or in giving her the lowest rating.  <u>Ahmed</u>, at 933 (plaintiff failed to offer proof that the evaluation resulting in her termination as a result of a RIF was influenced by prohibited criteria).  In fact, at her deposition, plaintiff conceded that all of the criteria considered in the PCCA was job-related.  Plaintiff's Deposition, pgs. 196-97.  Plaintiff has failed to provide any affirmative evidence that the RIF itself was a pretext.  The uncontradicted evidence demonstrates that Davidson's position was eliminated pursuant to a comprehensive, neutral program motivated by defendant's exercise of its business judgment, designed to streamline operations in the Distributor Reporting Department.  *See*, <u>Herrero</u>, at 484.[6]

Plaintiff also attempts to discredit her rating via the PCCA by pointing out that she had received favorable job performance evaluations in the past over several years.  These evaluations are not sufficient to show pretext.  They may show competency in the past, but "they do not render her more recent negative evaluations inherently untrustworthy".  <u>Rose-Maston v. NME Hospitals, Inc.</u>, 133 F.3d. 1104, 1109 (8th Cir. 1998).  Plaintiff ignores the fact that at the time of the PCCA rating, she had a negative job performance evaluation and had been placed on a PIP.  Furthermore, the past evaluations had been conducted by other supervisors using other criteria and do not inherently demonstrate that her PCCA rating was racially motivated.

As for retaliation, the same fatal flaw exists.  There is no evidence that plaintiff made any past complaints of racial discrimination to either Hill or Schott and that they used the PCCA to eliminate her position.

Plaintiff has failed to establish a *prima facie* case of race discrimination or retaliation due

---

[6]Also, plaintiff was not the only African-American employee subject to the PCCA.  Alicia Buchanan was evaluated under the PCCA, was rated third lowest, but was not identified for elimination, and (at the time of the summary judgment motion) remains employed by the defendant.

to the lack of any affirmative evidence or additional showing that race played any role in having her position eliminated as a result of the PCCA rating in accordance with the RIF.

Finally, plaintiff claims that the RIF was a pretext because of conversations with various representatives of the defendant. She contends that when she was told of her discharge by Carter Bright, he had told her it was "predetermined" and made no mention of the RIF. A close look at Bright's deposition testimony indicates that he told her that the decision was "predetermined" simply because the discharge decision had been made by other persons prior to his talking with the plaintiff, and any failure to mention the RIF was due to the fact that he was just filling in for the regular human resources representative, Rhonda Gibby (who was out of town that day). Bright Deposition, pg. 19.

Plaintiff next contends that during a conversation she had with Rhonda Gibby in mid-January (but prior to her conversation with Bright) Gibby stated that plaintiff's job "was bid". Plaintiff takes this to mean that her job had been bidded out and filled by someone else and that was why it was no longer available. Ms. Gibby attests that by using the term "bid" she meant generically that plaintiff's position had been eliminated and was no longer available, not that her position had been offered to other employees and someone had filled it. Gibby Declaration (Exhibit A attached to defendant's amended reply).

Whatever the true meaning of Gibby's use of the word "bid" is irrelevant. The undisputed fact is that plaintiff's position was eliminated and was never re-filled. Plaintiff has offered no affirmative evidence that any identified person applied for plaintiff's position and was hired or transferred into it.[7]

Next, plaintiff points to a telephone conversation she had with Heather Steele in November 2002 in which she alleges that Ms. Steele promised her a position with the company upon her return from medical leave. Assuming that Ms. Steele had made such a promise, this does

---

[7]After plaintiff's position was eliminated, and she was eventually discharged from her employment with the defendant, three (3) other white employees in her department left and were not replaced. Approximately, one year later, in December 2003 a white woman (Karen Tucker) transferred in to replace a white employee in the department (Penny Grant) who had transferred out in November 2003. Ms. Grant's transfer was not RIF motivated

not demonstrate pretext on the part of defendant as to the RIF being the reason for elimination of plaintiff's position. This alleged conversation took place prior to the decision to institute the RIF. Furthermore, if plaintiff had returned to work by November 6, 2002 at the end of her FMLA leave, she would have been entitled to her job back or a similar position.[8] Moreover, Ms. Steele was not the final decision-maker regarding plaintiff's continued employment, so whatever she may have said to plaintiff is inadequate to sustain a showing of pretext.

Plaintiff also attempts to show race discrimination in relation to her discharge[9] by arguing that although she was qualified for other positions, defendant still terminated her employment. Plaintiff claims that she interviewed for a position in the Customer Services Department but that a less-qualified white woman (Nikki Simpson) got the job. This argument too fails to provide evidence upon which any qualified juror could find race discrimination.

Plaintiff's race discrimination claims are limited to her discriminatory treatment in connection with her workload complaint, being placed on a PIP, having her position eliminated due to a RIF, and her eventual discharge from employment. Plaintiff does not have a failure-to-hire claim before this Court and the Court will not consider one at this late date, and without any evidence of exhaustion of administrative remedies.

Furthermore, the undisputed facts are that plaintiff interviewed for one of four open positions in the Customer Services Department. Declaration of George Saffold (Exhibit C attached to defendant's reply). Defendant hired two (2) white individuals and two (2) African-American individuals to fill these positions. Saffold Declaration. Plaintiff has offered absolutely no

---

[8]Plaintiff's FMLA claim will be addressed later in this memorandum.

[9]Plaintiff consistently confuses the elimination of her position in the Distributor Reporting Department as a result of the RIF as being the same thing as having her employment terminated by the defendant. Technically, the events are not one and the same. Plaintiff's position was eliminated as a result of the RIF; however, prior to the RIF plaintiff had taken FMLA leave. As will be explained later in greater detail, if plaintiff had returned at the end of her FMLA leave, defendant would have been obligated to return her to her original position or place her in a comparable position. However, because her position had been eliminated **and** she had failed to return after her FMLA leave expired, defendant had no legal obligation to find her another position within the company. Since plaintiff was not interested in interviewing for other positions (other than the one customer service position), and her position had been eliminated, and she had not returned to work at the end of her FMLA leave, defendant terminated her employment.

affirmative evidence to dispute the fact that these individuals were chosen due to superior pertinent experience in skills necessary for the position, and were perceived to have more interest in obtaining the position than plaintiff. Saffold Declaration. Plaintiff has offered no evidence that even remotely rises to the level of an inference of racial discrimination with regard to the hiring of Ms. Simpson for one of the four open positions in the Customer Services Department.[10]

The bottom line is that plaintiff has presented no affirmative evidence which remotely raises an inference of race discrimination with regard to the challenged employment actions. She does nothing more than speculate that all decisions regarding her employment had to be racially motivated because she is African-American. *See*, Plaintiff's Deposition, pgs. 50-51, 69, 180-182, 192-94, 202-05. She testified throughout her deposition, and via her affidavit, of "unfair" treatment and her "observation" that other white employees received what she believed to be more favorable treatment. However, she fails to provide any affirmative or objective evidence to support these observations and beliefs. Such lack of any corroborating evidence or mere allegations of unfair or unprofessional treatment fails to establish a *prima facie* case of disparate treatment based on race, or even more importantly, create a genuine issue of fact on the question of pretext. *See*, Griffin v. Super Valu, 218 F.3d. 869, 872 (8th Cir. 2000)(citations omitted). Plaintiff seeks this Court's review (and ultimately, a jury's review) of this case based on fairness, not evidence of racial discrimination. This the Court cannot do. Torlowei v. Target, 401 F.3d. 933, 935 (8th Cir. 2005). It is well-established in this circuit that federal courts do not sit as "super-personnel departments" re-examining the wisdom or fairness of the business decisions made by employers, except to the extent that those decisions involve intentional discrimination. Torlowei, at 935 (citation omitted); Saulsberry, at 868 (citations omitted); Herrero, at 485

---

[10]Plaintiff contends that there were "many positions open" for which plaintiff was qualified to fill upon her return to work in January 2003. In support of this contention, plaintiff provides the job posting of two (2) positions: Senior Accounting Specialist and Administrative Assistant. Plaintiff's Exhibit 19. Assuming that these positions were open and plaintiff was qualified, she has provided no evidence whatsoever that she applied for these positions by sending a resume to Blanche Eder as required on the postings, or expressed any interest to anyone in the Human Resources Department of her interest in interviewing for these positions. The undisputed evidence is that she only interviewed for one position, in the Customer Services Department.

(citation omitted). There is no affirmative evidence before this Court from which a reasonable jury could conclude that defendant discriminated against plaintiff on the basis of race or acted in retaliation for past complaints of race discrimination. Summary judgment will be granted to defendant on plaintiff's Title VII and §1981 claims of race discrimination and retaliation.

### FMLA Claim

Once again, plaintiff's claims are a bit obtuse but it appears she is claiming that defendant interfered with her FMLA rights by delaying payment of her short-term disability benefits and her vacation pay; and that defendant retaliated against her in discharging her upon her return to work. Plaintiff's claims are meritless as FMLA does not provide, in the first instance, for payment of benefits and/or vacation pay while out on leave; and defendant was not legally obligated to return plaintiff to her position of employment upon her return to work since her FMLA leave had already expired.

The FMLA provides eligible employees a total of twelve (12) workweeks of unpaid leave during any 12-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. 2612(a)(1) and (a)(1)(D); Throneberry v. McGhee Desha County Hospital, 403 F.3d. 972, 977 (8th Cir. 2005); Smith v. Allen Health Systems, 302 F.3d. 827, 832 (8th Cir. 2002); Hatchett v. Philander Smith College, 251 F.3d. 670. 676 (8th Cir. 2001); Reynolds v. Phillips & Temro Indus., 195 F.3d. 411, 413-14 (8th Cir. 1999); St. Hilaire v. Minco Products, 288 F.Supp.2d. 999, 1008 (D.Minn. 2003). Upon return from FMLA leave, an employee is generally entitled to be restored to the position s/he occupied prior to taking leave, or an equivalent position in terms of benefits, pay, or other terms and conditions. 29 U.S.C. §2614(a)(1); Throneberry, at 977; Hatchett, at 677; Reynolds, at 413-14; St. Hilaire, at 1008. However, this "right of restoration" is not without limitation. An employee is not entitled to restoration, however, if, at the end of the FMLA leave period, the employee is unable to perform an essential function of the job. 29 C.F.R. §825.214; Hatchett, at 677; Reynolds, at 414; St. Hilaire, at 1008.

Plaintiff's claim regarding her short-term disability benefits and vacation pay are not

actionable under FMLA.  FMLA specifically provides for **unpaid** leave for a definite period of time.  Plaintiff's receipt of disability benefits and vacation pay were governed by defendant's employee welfare plan(s) and corporate policy alone.  Any alleged problems regarding her short-term disability benefits and vacation pay are independent of any rights she may be entitled to protect under FMLA.  Thus, plaintiff's FMLA claim regarding interference with her FMLA rights fails.[11]

FMLA  makes it unlawful for any employer to "to discharge or in any manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. §2615(a)(2).  Thus, FMLA prohibits an employer from discriminating against an employee for exercising his/her rights under the Act, such as using the employee's taking of FMLA leave as justification for the challenged employment action.  To establish a *prima facie* case of FMLA retaliation, an employee must show 1) that s/he engaged in activity protected under FMLA; 2) that the employee suffered an adverse employment action; and 3) that a causal connection existed between the employee's action and the adverse employment action.  Allen, at 832; Hatchett, at 677-78.  In the instant case, plaintiff did not suffer an adverse employment action because she was not entitled to restoration of her job with defendant.

As stated before, FMLA's guarantee of restoration of the employee's position is only applicable if the employee returns on or before the expiration of the statutory 12-week leave period; and if capable of performing the essential function(s) of the job.  It is undisputed that plaintiff did not return to work until well after the expiration of her FMLA leave; therefore, she forfeited any restoration rights.  Furthermore, the decision to eliminate her position was made after

---

[11]Plaintiff asserts that Ms. Schott made the statement "I betcha, if we don't pay her for FMLA, she wouldn't be taking any type of leave."  Plaintiff's Response, pgs. 3-4.  Assuming that this statement was made, it still does not support any claim for interference with plaintiff's FMLA rights.  As a matter of law, FMLA does not provide for any type of "pay" during a FMLA leave; and furthermore, the evidence on the record shows that plaintiff took her entire 12-week FMLA leave, an extended short-term disability leave, and was paid her benefits as entitled under the defendant's short-term disability plan.  Moreover, the evidence before the Court shows that plaintiff was properly paid her vacation pay and that any delay in payment of her short-term disability benefits was due to the re-certification process involving plaintiff, her treating physician, and the disability insurance carrier - not the defendant.  Graham Declaration (Exhibit B attached to defendant's amended reply).

plaintiff's FMLA leave had expired, as well as the final decision to terminate her employment with defendant. Thus, defendant did not eliminate plaintiff's position or terminate her employment during her FMLA leave or upon her return prior to or on her FMLA leave expiration date.

Plaintiff attempts to show retaliation by pointing to an alleged statement by Ms. Steele in which Ms. Steele "clearly and definitively [stated] that upon her return from **Short Term Disability** the company would bring her back to an available position for which she was qualified for within the company." Plaintiff's Response, pg. 4 (emphasis added). Assuming that this statement was made, it still fails to raise an inference of retaliation under FMLA. Firstly, plaintiff's FMLA leave expired on November 6, 2002 and plaintiff alleges that Ms. Steele's statement was made on November 17, 2002; thus, plaintiff's restoration rights were no longer viable under FMLA. Secondly, by plaintiff's own account, this statement refers to restoring plaintiff to an available position for which she was qualified after her **short-term disability** leave expired, not her FMLA leave. Plaintiff concedes that she was not relying on this statement as regards her restoration rights under FMLA, but rather in connection with her perceived rights under the defendant's short-term disability plan. Any alleged wrongdoing in connection with defendant's short-term disability plan and plaintiff's medical leave thereunder is not before this Court to consider.

Finally, in order to be entitled to restoration under FMLA, plaintiff would have to show that on or before November 6, 2002 she was able to perform the essential functions of her job. Plaintiff has failed to provide any affirmative evidence showing that she was able meet this requirement. The undisputed evidence is that her doctor certified and recertified her as medically unable to return to work and therefore entitled to short-term disability benefits during and after her FMLA leave had expired. Plaintiff's Exhibit 15. She was not released by her doctor to return to work until January 21, 2003, again after the expiration date of her FMLA leave. Plaintiff's Exhibit 18. Since the FMLA does not require an employer to allow an employee to stay in a position that the employee cannot perform, defendant did not violate the FMLA by not restoring Davidson to her job. Hatchett, at 677; St. Hiliare, at 1009. Plaintiff has failed to establish a *prima facie* case of

retaliation under FMLA and summary judgment will be granted to defendant on plaintiff's FMLA claim(s).

**Missouri Service Letter Act claim**

Plaintiff concedes that she brought this same claim in the Circuit Court for St. Louis County but asserts that she is entitled to litigate it again because the state court's entry of summary judgment for defendant was not an adjudication on the merits. Plaintiff's argument is meritless.

"Under the doctrine of res judicata, a judgment on the merits in a prior lawsuit bars a second suit involving the same parties or their privies based on the same cause of action." Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979); *see also*, Professional Management Associates v. KPMG, L.L.P., 345 F.3d. 1030, 1032 (8th Cir. 2003); Lundquist v. Rice Memorial Hosp., 238 F.3d. 975, 977 (8th Cir. 2001); Costner, et. al. v. URS Consultants, 153 F.3d. 667, 673 (8th Cir. 1998); Landscape Properties, Inc. v. Whisenhunt; 127 F.3d. 678, 682 (8th Cir. 1997); United States v. Gurley, 43 F.3d. 1188, 1195 (8th Cir. 1994). The application of the doctrine of *res judicata* has three requirements: 1) the prior judgment was rendered by a court of competent jurisdiction; 2) the prior judgment was a final judgment on the merits; and 3) the same cause of action and the same parties or their privies were involved in both cases. Lundquist,, at 977; DeLlano v. Berglund, et. al., 183 F.3d. 780, 781(8th Cir. 1999); Costner, at 673; Murphy v. Jones, 877 F.2d. 682, 684 (8th Cir. 1989), citing Headley v. Bacon, 828 F.2d. 1272, 1274 (8th Cir. 1987). Even if a plaintiff raises a new legal theory of recovery in the second action, *res judicata* bars all claims that were or could have been raised in an earlier action. "Final judgment on the merits of an action precludes the same parties from relitigating issues that were or could have been raised in that action." Lundquist, at 977 *citing* Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398-99 (1981); *see also*, Ruple v. City of Vermillion, South Dakota, 714 F.2d. 860, 862 (8th Cir. 1983)("Absent special circumstances, all of the theories that a dismissed employee can bring to play to challenge the dismissal should be raised and decided in the same lawsuit."); Biermann v. United States of America, 67 F.Supp.2d. 1057, 1060 (E.D.Mo. 1999). "[I]f a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action . . . the two cases are really the same `claim' or `cause of action' for purposes of *res judicata*." Ruple,

at 861; *see also*, <u>Landscape Properties</u>, at 683 *citing* <u>Ruple</u>. The bottom line is whether the wrong for which redress is sought is the same in both actions. <u>Costner</u>, at 674 *citing* <u>Gurley</u>, at 1196. However, *res judicata* does not apply to claims that did not exist when the earlier lawsuit was filed. <u>Lundquist</u>, at 977. "[I]t is well settled that claim preclusion does not apply to claims that did not arise until *after* the first suit was filed." <u>Baker Group, L.C. v. Burlington Northern & Santa Fe Ry. Co.</u>, 228 F.3d. 883, 886 (8th Cir. 2000).

Contrary to the plaintiff's assertion, summary judgment is considered to be a determination on the merits. <u>King v. Hoover Group</u>, 958 F.2d. 219, 221 (8th Cir. 1992); *see also*, <u>Kulinski v. Medtronic Bio-Medicus, Inc.</u>, 112 F.3d. 368, 373 (8th Cir. 1997)(*citing* <u>King</u>, *supra.*); <u>Dicken v. Ashcroft</u>, 972 F.2d. 231, 233 n.5 (8th Cir. 1992)(*citing* <u>King</u>, *supra.*); <u>Harmon v. Headley</u>, 95 S.W.3d. 154, 157 (Mo.App. 2003)(*citing* <u>Williams v. Rape</u>, *infra.*); <u>Williams v. Rape</u>, 990 S.W.2d. 55, 59 (Mo.App. 1999).[12] Thus, plaintiff's Missouri Service Letter Act claim is precluded from consideration by this Court under the doctrine of *res judicata*.

In light of the Court's findings above, no material issues of fact exist as to defendant's liability on any of the plaintiff's claims, and summary judgment will be granted to the defendant Mallinckrodt[13] on all of the plaintiff's claims.

Dated this   25th   day of May, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[12]Although this is not a diversity case, the Court thinks it is still important to note that Missouri law also establishes that summary judgment is an adjudication on the merits for purposes of *res judicata*.

[13]Even if the Court were to consider Mallinckrodt and Tyco Healthcare as two independent defendants in this case, all of the Court's findings of fact and conclusions of law are equally applicable to Tyco Healthcare.